**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Bradley Greene,<br><br>Plaintiff,<br><br>v.<br><br>SYNGENTA CROP PROTECTION, LLC and CHEVRON U.S.A, INC.<br><br>Defendants. | Case No.:<br><br>JURY TRIAL DEMANDED |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1. Plaintiff Bradley Greene ("Plaintiff") hereby files this Complaint at Law against the below-named Defendants. Plaintiff seeks equitable relief, monetary restitution, and/or compensatory and punitive damages. Plaintiff makes the following allegations based upon personal knowledge and information and belief, as well as the investigation carried out by counsel.

**SUMMARY**

2. This is a tort action, sounding separately in negligence and products liability, against the designers, manufacturers, marketers, distributors, and sellers of Paraquat.

3. Paraquat is a non-selective, "burn-down" herbicide that kills nearly all forms of plant life. Paraquat is often used to kill weeds and prepare crops for harvest. Paraquat has been available in the United States since 1964 or 1965 and is still commonly used today.

4. Low-dose exposure to Paraquat causes neurological injuries that progress to become Parkinson's disease.

5. The same biological processes that make Paraquat effective as an herbicide make it effective at damaging the part of the brain that makes the neurotransmitter needed for voluntary motor control. That damage is Parkinson's disease.

6. Defendants are the designers, manufacturers, and distributors of Paraquat. Syngenta Crop Protection LLC ("Syngenta") is the successors to the original designers and manufactures of Paraquat. Chevron U.S.A. Inc. ("Chevron") is the successor to the original designers, formulators, and distributors of Paraquat in the United States. Chevron also had various other Paraquat-related businesses.

7. Defendants worked in tandem to design, manufacture, market, and distribute Paraquat, and to ensure that the causal link between Paraquat and Parkinson's disease remained hidden from the public, from Plaintiff, and from the medical and scientific communities. Defendants are jointly and severally liable to Plaintiff on all causes of action as alleged herein.

8. Defendants have known that Paraquat is unreasonably dangerous since before it first entered the stream of commerce in 1964 or 1965. Defendants chose to conceal that information from the public despite being fully aware of the exceptionally high risk that their misrepresentations would result in harm to Paraquat end-users.

9. Plaintiff is an end-user of Paraquat. Plaintiff is among the intended users of Paraquat: farmers, agricultural workers, and others who came into contact with Paraquat while the pesticide was being used to kill weeds and prepare crops for harvest, among other intended uses. As a result of their exposure to Paraquat, Plaintiff has suffered neurological injuries including Parkinson's disease and precursor ailments that progress into Parkinson's disease.

10. At all relevant times, it was reasonably foreseeable to Defendants that Paraquat would cause Plaintiff's injuries.

11. Plaintiff asserts negligence, products liability, and intentional theories of liability against Defendants. Plaintiff prays for relief—including compensatory and punitive damages—for injuries suffered as a result of their exposure to Paraquat.

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

12. This Court has subject matter jurisdiction over this action because diversity exists under 28 U.S.C. § 1332(a)(3).

13. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, because Plaintiff seeks an amount that exceeds this sum or value on each of his claims against each Defendant.

14. Complete diversity exists because this is an action between citizens of different states in which a citizen or subject of a foreign state is an additional party, in that:

15. Plaintiff is a citizen of the state of New Mexico.

16. Syngenta is a citizen of the States of Delaware and North Carolina.

17. Chevron is a citizen of the States of Pennsylvania and California.

### *Personal Jurisdiction*

18. This Court has personal jurisdiction over Syngenta because Syngenta is a corporation doing business within the State of Illinois. Syngenta previously sold and continues to sell its Paraquat products throughout the State of Illinois. In addition, Syngenta maintains sufficient minimum contacts with the State of Illinois such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice. Specific to this case, Syngenta engaged in the

business of developing, manufacturing, testing, packaging, marketing, distributing, and labeling pesticides containing Paraquat in Illinois, as such that filing a lawsuit in Illinois by a person injured by Paraquat is foreseeable. Syngenta purposefully availed itself of the privilege of conducting activities within the State of Illinois, thus invoking the benefits and protections of its laws.

19. This Court has personal jurisdiction over Chevron because Chevron advertises and sells goods, specifically pesticides containing Paraquat, throughout this District of Illinois. It derived substantial revenue from goods and products used in this District. It expected its acts to have consequences within the State of Illinois, including the foreseeable possibility of a lawsuit in Illinois by a person injured by Paraquat, and derived substantial revenue from interstate commerce. Chevron purposefully availed itself of the privilege of conducting activities within the State of Illinois, thus invoking the benefits and protections of its laws.

***Venue***

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in the Southern District of Illinois, as Defendant's alleged wrongful conduct occurred throughout Illinois.

21. Plaintiff had no knowledge and had no way of acquiring knowledge about the risk of serious illness associated with exposure to Paraquat.

22. Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Paraquat is injurious to human health.

23. Plaintiff had no information which would cause a reasonable person to suspect the risks associated with exposure to Paraquat; nor would a reasonable and diligent investigation by Plaintiff have led to discovery that Paraquat would cause or had caused Plaintiff's injuries.

24. Defendants failed to disclose critical safety information about its product Paraquat, and instead consistently made false representations as to the safety of Paraquat, and those false representations prohibited Plaintiff from discovering valuable information which would have prevented this claim.

25. Defendants were under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Paraquat.

26. Defendants knowingly, affirmatively, and actively concealed safety information concerning Paraquat, and the serious risks associated with the use of and/or exposure to its products, including Paraquat.

## PARTIES

***Plaintiff***

27. Plaintiff Bradley Greene is domiciled in New Mexico. As alleged herein, Plaintiff was exposed to Paraquat from approximately 2005 to 2007. As a result of that exposure, Plaintiff started experiencing symptoms around 2016 associated with Parkinson's disease.

***Syngenta***

28. Paraquat was first designed, manufactured, patented, and distributed by a British entity called Imperial Chemical Industries and its affiliates. Through a series of mergers and acquisitions, Imperial Chemical Industries and its affiliates' successors are Syngenta AG and Defendant Syngenta Crop Protection LLC. This Complaint therefore ascribes Imperial Chemical Industries' and its affiliates' and successors' actions, as well as the actions of other companies to which Syngenta is a successor, to Syngenta. Syngenta claims that Syngenta Crop Protection LLC is a resident of Delaware and no other state.

***Chevron***

29. Syngenta made a deal to partner with the California Chemical Company, Ortho Division to design, manufacture, and distribute Paraquat in the United States. Through a series of mergers and acquisitions, California Chemical Company and its successors' and affiliates' (including Chevron Chemical Company) ultimate successor is Defendant Chevron U.S.A. Inc. This Complaint therefore ascribes California Chemical Company's actions, as well as the actions of its affiliates and other companies to which Chevron is a successor, to Chevron. Chevron also manufactured other products recommended for use with Paraquat.

30. Chevron is incorporated in Pennsylvania and its principal place of business is in San Ramon, California.

## TERMS

31. As used in this Complaint, "Paraquat" refers to all formulations of products containing the active ingredient Paraquat, including, but not limited to, Gramoxone, or any other formulation containing Paraquat.

32. As used in this Complaint, "formulator" refers to a company that combines technical Paraquat or other essential Paraquat chemical ingredients with other chemicals to create a product that is sold to end-users. As used here, all such products have Paraquat as their active ingredient.

33. As used in this Complaint, a "surfactant" is a chemical added to Paraquat, usually by an end-user prior, to using Paraquat. Surfactants help Paraquat stick to the surface of weed leaves and accelerate the movement of Paraquat through the epidermis of plants, into the inside of plants where it cannot wash off and where it comes into contact with plant cells.

## ALLEGATIONS

***Discovery and Design of Paraquat***

34. Paraquat is a man-made chemical formulation; it does not occur naturally.

35. Paraquat was first discovered in the 1880s but, at that time, its herbicidal properties were not known.

36. In the 1930s, organic chemists discovered "free radicals"—unstable molecules that damaged human cells, including the DNA in those cells. Free radicals can occur naturally or be caused by external stressors or substances. Free-radical molecules come to possess an uneven number of electrons. That uneven number allows them to easily react with other molecules through a process called "oxidation." Scientists discovered that a cascade of these oxidation reactions were toxic to human cells because they damaged the cells, interrupted their normal operation, and corrupted the cells' DNA. These cascades of oxidation reactions are sometimes called "redox cycling." And the net (toxic) effects of redox cycling are sometimes referred to as "oxidative stress."

37. Prior to the 1950s, the same oxidative stress that was known to be toxic to human and animal cells was found to be toxic to plant cells.

38. In or about 1955, scientists at Syngenta discovered that Paraquat caused redox cycling and oxidative stress. Syngenta scientists discovered that Paraquat cations would continuously and perpetually lose and then regain an oxygen ion. They realized that there was no natural stoppage for this redox cycling; it would go on and on in perpetuity, causing significant oxidative stress.

39. The Syngenta scientists discovered that this redox cycling would result in oxidative stress that would be toxic to plant cells and interfere with a plant's ability to conduct photosynthesis. Paraquat-induced redox cycling and oxidative stress, the Syngenta scientists concluded, made Paraquat effective as an herbicide.

40. Paraquat was effective as an herbicide because it induced redox cycling and caused oxidative stress in plants in the same way that the free-radical literature had documented redox cycling and oxidative stress disrupted the cellular function and damaged the cellular DNA of human cells. Indeed, in the 1950s Syngenta personnel commented that Paraquat was toxic, primarily affected the human central nervous system, and could be absorbed through human skin.

41. However, Paraquat was not effective on its own. Without a surfactant, Paraquat would run off the leaves of plants instead of penetrating into the plant's cells where redox cycling could cause oxidative stress and disrupt photosynthesis. Syngenta scientists tested many of the surfactants on the market to determine their compatibility with Paraquat.

42. Chevron manufactured surfactants that could be used with Paraquat. Generally, these surfactants were non-ionic and readily available in the United States.

43. Syngenta obtained various U.S. and U.K. patent protections for Paraquat in or about 1960 and 1961 and began selling Paraquat internationally in 1962.

44. Generally, Syngenta would manufacture what it called "technical Paraquat," an essential form of the active ingredient that had to be formulated further into a final, sale-ready product. Syngenta would partner with other companies to formulate and distribute Paraquat, including Chevron.

***Partnership with Chevron***

45. At roughly the same time that Syngenta obtained patent protection for Paraquat, Chevron was looking to increase its presence in the agricultural chemical market. Chevron already manufactured several agricultural chemicals, including non-ionic surfactants that could help herbicides penetrate a plant's dermis and attack a plant's cells. But Chevron sought to expand into herbicides and pesticides, which are sometimes referred to as "crop protection" business lines.

46. As part of that expansion, on or about May 19, 1960, Chevron entered into an agreement with Syngenta that would allow Chevron to evaluate Paraquat for potential sale in the United States. Pursuant to that agreement, Syngenta supplied Chevron with information concerning Syngenta's Paraquat formulations, their herbicidal properties, and data relating to safety and exposure risk.

47. Chevron reviewed these data and conducted extensive market research to determine the potential demand for Paraquat in the United States. During this period in the early 1960s, Chevron personnel reported that Paraquat was toxic and potentially hazardous to humans. Nonetheless, after several years of market evaluation and negotiation, Chevron and Syngenta decided to enter a partnership.

48. On or about May 4, 1964, Syngenta entered into a licensing agreement with the Chevron, whereby Chevron would act as the exclusive formulator and distributor of Paraquat in the United States.

49. The agreement also mandated that Syngenta and Chevron share information concerning the formulation, use, and sale of Paraquat, and permitted that information to be shared with companies Syngenta and Chevron contracted with to formulate or sell Paraquat. The companies also agreed to share information concerning end-user safety.

50. Under the agreement, Syngenta would manufacture technical Paraquat and Chevron, along with other companies Syngenta and Chevron contracted with, would formulate the technical Paraquat into the use-ready Paraquat that Chevron would sell to distributors, and that would ultimately be purchased and used by an end-user.

***Paraquat Was Known to be Unreasonably Dangerous***

51. Before Paraquat was ever sold in the United States, both Syngenta and Chevron were aware that Paraquat was unreasonably dangerous.

52. By 1958, internal Syngenta research reports opined that Paraquat was at least moderately toxic to humans, and that the main area of the human body affected was the central nervous system. Those research documents proposed further evaluation of Paraquat's toxicity before placing it into the stream of commerce. This research was either not done or its results were suppressed.

53. By 1960, Syngenta was aware that Paraquat would undergo redox cycling and could accumulate in mammalian tissues.

54. Similarly, by at least 1963, internal Chevron documents reveal that Paraquat was potentially hazardous to human health, and that insufficient research had been done to evaluate its potential neurotoxic effects.

55. Further, following the start of global sales of Paraquat in 1962, Syngenta observed that workers involved in its manufacture of Paraquat were experiencing nose bleeds and other symptoms consistent with toxic exposure. As a result, Syngenta changed its manufacturing processes, creating a so-called "closed system" where engineering controls would prevent Syngenta employees from ever coming into contact with Paraquat.

56. Syngenta shared this internal research data with Chevron. These data demonstrated that Paraquat was highly toxic and had the potential to seriously injure or kill humans exposed to highly-

concentrated doses of the herbicide. The data also indicated that low-dose exposure had the potential to affect the human central nervous system.

57. Nonetheless, after consummating their partnership, Syngenta and Chevron embarked on a full-scale joint operation to manufacture and sell Paraquat in the United States while hiding the risks of low-dose Paraquat exposure.

***Syngenta and Chevron Place Paraquat on the Market***

58. Prior to the first U.S. sale of Paraquat in 1964 or 1965, Syngenta and Chevron had to register Paraquat with various state and federal authorities. Registration required Syngenta and Chevron to agree on a formulation of the product.

59. Aware that Paraquat was highly toxic to humans, Syngenta and Chevron jointly decided to minimize the appearance of toxicity. Both companies were aware—through internal research data as well as their experience designing and selling surfactants—that surfactants would dramatically increase the toxicity of Paraquat.

60. For instance, internal Syngenta research documents show that surfactants were found to speed Paraquat's penetration into animal cells, increase the concentration of Paraquat in animal cells, and increase the bioavailability—that is, the proportion a substance that is able to actively affect the body—of Paraquat. These research documents conclude that the inclusion of surfactants in Paraquat formulations is likely to increase the Paraquat's toxicity.

61. On information and belief, these data—or summaries of them—were shared with Chevron pursuant to their partnership agreement. Chevron and Syngenta held regular meetings to discuss (among other things) such topics.

62. To mask Paraquat's toxicity, Syngenta and Chevron decided to sell Paraquat in the United States without a surfactant. The implications of that decision were twofold.

63. First, Syngenta and Chevron jointly submitted scientific studies and reports in support of their applications to state and federal regulators that showed lower levels of toxicity than what would actually be experienced by end-users of Paraquat.

64. Second, Syngenta and Chevron knew that requiring end-users to mix Paraquat with a surfactant before using it would dramatically increase the risk of low-dose Paraquat exposure. Internal company documents from both Syngenta and Chevron commented upon the increased risk that end-users would come into contact with Paraquat while mixing the herbicide with surfactant or cleaning equipment used in the mixing process.

65. Meanwhile, Syngenta decided to sell Paraquat pre-mixed with surfactant in certain markets outside of the United States.

66. Paraquat was registered by state and federal authorities using the Syngenta-produced, Chevron-submitted data that masked the risks of human exposure.

67. Syngenta and Chevron began manufacturing, formulating, and selling Paraquat in the United States pursuant to their partnership agreement and without a pre-mixed surfactant in 1964 or 1965.

68. Several of those products were accompanied by an instruction to use a particular surfactant: X-77 Spreader (sometimes called Ortho X-77). X-77 was designed and manufactured by Chevron and licensed to multiple other chemical companies for manufacture and/or distribution.

69. Chevron produced ads and other promotional materials that referred to X-77 as more efficient and economical when used with Paraquat and recommended that end-users mix Paraquat with X-77 in particular.

***Syngenta and Chevron Create Nationwide Distribution Model***

70. As the sole U.S. formulator and distributor of Paraquat, Chevron lacked capacity to make all of the Paraquat needed to satisfy the increasing demand for the herbicide throughout the United States.

71. To help alleviate the strain, with Syngenta's knowledge and authorization per the companies' partnership agreement, Chevron began to contract with third-party companies to formulate technical Paraquat received from Syngenta into Paraquat ready for sale to end-users and to perform other manufacturing tasks like bottling the consumer-ready Paraquat received from formulators.

72. For example, FMC was one of the key third-party companies that Chevron brought into the manufacturing and formulation process.

73. Chevron contracted with FMC to formulate technical Paraquat that Chevron received from Syngenta into consumer-ready Paraquat. FMC received data and documentation from Chevron, including a formulator handbook that described the technical specifications of Paraquat including its mode of action (i.e., redox cycling and oxidative stress), and prescribed the methods and manner for formulating consumer-ready Paraquat. In fact, FMC was so successful in implementing Chevron's formulator handbook that Chevron held FMC out to other formulators as an example of best practices.

74. Chevron also contracted with FMC to bottle Paraquat received from other formulators. This involved shipping large containers of consumer-ready Paraquat to FMC facilities for bottling into the final consumer-ready packaging and affixing the relevant labels.

75. Consumer-ready Paraquat was shipped throughout the United States, sometimes directly to local distributors like farm collectives, supply stores, or agricultural organizations, and sometimes to mid-market wholesalers like FMC.

76. Chevron and Syngenta also maintained a large network of sales personnel tasked with selling Paraquat to end-users. Chevron also embarked, with Syngenta's knowledge and approval, on aggressive marketing campaigns to promote Paraquat as the key to so-called "no-till" farming. Chevron also utilized the large sales networks of distributor sales personnel such as FMC to promote Paraquat.

77. These marketing efforts also included co-opting numerous "thought leaders" throughout the United States to encourage end-users to adopt aggressive Paraquat use. These thought leaders included agricultural extension services connected with major universities, agricultural colleges, academic researchers, and wholesalers (who often had name recognition in the agricultural community) such as FMC.

78. These marketing efforts also included the production and distribution of ads and leaflets extolling the benefits of Paraquat. In many of these ads and leaflets, farmers are depicted using Paraquat without any personal protective equipment—they are not wearing masks or gloves, not utilizing respirators; they are wearing everyday work clothes while mixing or spraying Paraquat.

***Sales of Paraquat Mushroom as Evidence of Human Toxicity Mounts***

79. Syngenta and Chevron's aggressive marketing efforts had their desired effect—shortly after sale of Paraquat began in the United States, it became a blockbuster.

80. Many end-users purchased Paraquat from local farm collectives, supply stores, or agricultural organizations. And while, starting in the 1970s, Paraquat was technically a "restricted-use" pesticide—meaning that it was only supposed to be sold to licensed applicators who had received some basic safety training and passed a short exam—many local distributors sold to end-users (whom the local distributors had often known for years) who were not licensed applicators. In fact, many local distributors did not even mention the applicator requirement to purchasers of Paraquat, to the extent they knew of it themselves. And Syngenta and Chevron undertook no meaningful effort to ensure that only licensed applicators could acquire Paraquat.

81. While the sales of Paraquat nationwide mushroomed, evidence of the herbicide's toxicity to humans grew further.

82. Beginning in the mid-to-late 1960s, just a few years after Paraquat came on the market, several acute exposure incidents became known to Syngenta and Chevron. In these incidents, an end-user would accidentally ingest or otherwise be exposed to a large dose of Paraquat. These incidents were almost always fatal—the victim would succumb to acute trauma to oxygen-rich organs, usually within a few days of exposure.

83. These acute-exposure incidents often resulted in an autopsy of the victim, the results of which were supplied to Syngenta and Chevron. These autopsy results repeatedly showed detectable amounts of Paraquat in the victim's brain, as well as other oxygen-rich organs like the lungs.

84. Syngenta received similar autopsy results from outside the United States, which again showed that Paraquat was crossing the blood-brain barrier and entering the human brain.

85. These external reports were confirmed by internal research available to both Syngenta and Chevron.

86. In the face of mounting deaths from Paraquat poisoning, Syngenta was nonetheless resistant to updating its labeling to include a skull and crossbones out of fear that it would hurt their bottom line. And Defendants never sought to include any language on the Paraquat labeling or in their marketing and training materials related to potential central nervous system injury.

87. In 1969, Syngenta conducted (and shared with Chevron) a study that administered small amounts of Paraquat to lab animals via dermal exposure, oral exposure, and by injection into the abdomen. The study detected Paraquat in the exposed lab animals' brains, leading to the conclusion that Paraquat could enter the brain and cause neurotoxicity.

88. Further research conducted in 1974 by Syngenta (and shared with Chevron and its contractors) revealed that Paraquat could pass through the blood-brain barrier by active transport. This means that instead of diffusing passively across the blood-brain barrier, Paraquat was actively transported

by the body across the blood-brain barrier. Thus, Paraquat in the blood would ultimately end up in the brain.

89. Additionally, research available in the public domain and known to Syngenta and Chevron and their contractors, demonstrated that inhaled chemicals could pass directly into the brain via the olfactory bulb. This research showed that the olfactory bulb is not protected by the blood-brain barrier. Thus, Paraquat inhaled by an end-user can enter the brain directly through the olfactory bulb without having to traverse the blood-brain barrier.

90. In about 1969, Syngenta scientists analyzing Paraquat concluded that low-dose exposure to the herbicide was likely to cause immediate neurotoxic damage, but that damage was unlikely to be detected until later. In other words, Paraquat was latently neurotoxic, Syngenta concluded. Chevron was made aware of these results and conclusions.

91. At the same time that Syngenta and Chevron knew that Paraquat in the blood could get into the brain (or enter the brain directly via the olfactory bulb) and cause damage that would not be discovered until later, they knew that end-users were being exposed to Paraquat such that it entered their bloodstream.

92. In 1969, a Syngenta scientist published the results of field studies conducted in Malaysia that attempted to measure the real-world Paraquat exposure of a Paraquat end user. The study followed several end-users as they mixed and sprayed Paraquat for agricultural purposes. The Syngenta researcher observed that workers generally did not wear protective equipment (and that none was supplied where they were working). Following Paraquat use, the researcher detected Paraquat in study participants' urine. Though the researcher did not analyze participants' blood, the fact that Paraquat was detectable in the participants' urine meant that it had been processed through participants' cardiopulmonary system and was in participants' blood.

93. The results of this study were shared with or available to Chevron.

94. Later, in or about 1980, Syngenta and Chevron jointly conducted a study of agricultural working conditions that concluded that workers often came into contact with Paraquat by touching equipment (including spraying and mixing equipment) contaminated with Paraquat with their bare hands.

95. By the beginning of the 1980s, Syngenta and Chevron, as well as their contractors and agents, were aware that end-users were commonly being exposed to low doses of Paraquat, which was entering their blood and crossing over into their brains (or entering their brains directly via the olfactory bulb) and causing damage that would not be detected until later.

96. Syngenta and Chevron were aware through field studies of the possibility of Paraquat to enter agricultural workers' blood streams even if they were using protective equipment.

97. Syngenta and Chevron were aware through field studies that agricultural workers often did not follow the product labeling, necessitating additional precautions to keep them safe.

***Paraquat Becomes a Lab Favorite for Inducing Parkinson's***

98. In 1982, after Syngenta and Chevron and their contractors and agents were aware that Paraquat was latently neurotoxic in end-users, the scientific community became aware of the connection between Paraquat and Parkinson's disease.

99. That year, a group of heroin users in California suddenly began exhibiting symptoms of advance-stage Parkinson's disease.

100. Researchers determined that the heroin users had injected themselves with a chemical called MPTP as part of a botched attempt to get high. This discovery was a breakthrough in Parkinson's disease research because it allowed researchers to cause Parkinson's in lab animals using MPTP.

101. Almost immediately, scientists began turning to Paraquat because it was widely available and, chemically, is almost identical to MPTP. Starting in the 1980s and continuing to today, researchers use Paraquat exposure to induce Parkinson's disease in lab animals.

102. The reason Paraquat induces Parkinson's disease is that its redox cycling results in oxidative stress in the portion of the brain responsible for generating dopamine, the neurotransmitter that controls voluntary movement. This oxidative stress interferes with dopamine production and results in Parkinson's disease.

103. Parkinson's disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system—the part of the central nervous system that controls movement.

104. The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance), among others.

105. Parkinson's disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements, among others.

106. Non-motor symptoms—such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression—are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

107. There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression. And the treatments most commonly prescribed for its motor symptoms tend to become progressively less effective, and to increasingly cause unwelcome side effects the longer they are used.

108. When Paraquat enters the body, it enters the brain and causes selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc").

109. Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

110. The death of dopaminergic neurons in the SNpc decreases the production of dopamine. Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

111. The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

112. Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

113. Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of the disease.

114. Scientists seeking to study Parkinson's disease use Paraquat to create oxidative stress because of "redox properties" that are inherent in Paraquat's chemical composition and structure: it is a strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

115. The redox cycling of Paraquat in living cells interferes with cellular functions that are necessary to sustain life-with photosynthesis in plant cells, and with cellular respiration in animal cells. The redox cycling of Paraquat in living cells creates a "reactive oxygen species" known as superoxide

radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells. Because the redox cycling of Paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of Paraquat can trigger the production of countless molecules of destructive superoxide radical.

116. Syngenta, Chevron, and their contractors and agents, knew that Paraquat was neurotoxic, likely to enter the brains of end-users, and could cause Parkinson's disease in particular.

***Chevron Becomes Uneasy and Partially Exits the Paraquat Market***

117. Syngenta and Chevron's reaction to the growing scientific literature linking Paraquat and Parkinson's was not to amend the label or the marketing / advertising materials, warn their customers, or otherwise take any precautions. Instead, they claimed publicly in ads, leaflets, and through sales personnel that no link existed.

118. Despite their strong public statements to the contrary, worries grew within Chevron that Paraquat was neurotoxic.

119. The risks Chevron perceived were not to its loyal customers and end-users, however. Instead, Chevron worried that the labels it had lobbied for with state and federal regulators would be deemed insufficient, which would cast aspersions on the company's credibility with regulators. And Chevron worried that it would be subject to mass tort liability for the latent injuries Paraquat was causing to end-users—the next asbestos, Chevron personnel fretted internally.

120. But still, Chevron did nothing to warn the public or to alter its sales materials, which continued to depict farmers mixing and spraying Paraquat without wearing any protective equipment.

121. Meanwhile, Syngenta appeared to show no such compunctions. Instead of worrying about being responsible for the next asbestos, Syngenta (consistent with its partnership agreement with Chevron) began to sell Paraquat in the United States independently of Chevron in 1982 or 1983.

122. Chevron and Syngenta's partnership agreement was due to terminate in 1986 absent a renegotiation and renewal. Despite their worries about the neurotoxicity of Paraquat, Chevron engaged in multiple rounds of detailed negotiations with Syngenta with a view to securing an extension to their partnership.

123. Ultimately, no such agreement was reached, and Chevron agreed to stop formulating and distributing Paraquat in or about 1986. However, Chevron still had a huge quantity of consumer-ready Paraquat in its possession. Some of that surplus was sold back to Syngenta, but some remained in Chevron's possession and, in addition to other Chevron-formulated Paraquat, was ultimately sold to distributors and end-users as late as approximately the mid-1990s.

124. Part of Chevron's calculus in departing the Paraquat business was economic. In 1976, glyphosate had become available as another so-called "burn down" herbicide. Like Paraquat, glyphosate (which goes by the trade name Roundup) will kill just about any type of plant it comes into contact with. However, glyphosate is not as toxic in highly-concentrated doses and was perceived by many in agriculture as safer than Paraquat. Glyphosate is also sold pre-mixed with surfactant, making it cheaper and more convenient for end-users, who do not have to buy and mix a surfactant of their own.

125. But a major part of Chevron's departure from the Paraquat business was its knowledge that Paraquat was already causing progressive neurodegenerative disease in its customers.

126. At the time it ended its partnership with Syngenta, Chevron knew that there were no plans to warn end-users or anyone else about the dangers of low-dose Paraquat exposure.

127. At the time it ended its partnership with Syngenta, Chevron knew that the surfactant it manufactured, X-77, was recommended for use with Paraquat, including on certain Paraquat labels that instructed end-users to use X-77.

128. Chevron would continue to sell X-77 surfactants until at least 1993 and Chevron-designed and manufactured X-77 was still being sold on the market until at least approximately the late 1990s.

***Evidence of the Paraquat–Parkinson's Link Continues to Mount***

129. At all relevant times, Syngenta and Chevron declined to perform simple neurological testing, knowing that such testing would demonstrate the association of Paraquat and Parkinson's Disease/Neurological injury.

130. In the registration or sale of Paraquat in the United States, Chevron did not conduct any toxicology or other studies on its own but instead relied on the studies of Syngenta. At all relevant times, Chevron possessed the technical capacity and resources to conduct toxicology and other studies of Paraquat but elected not to.

131. Chevron later characterized Syngenta's studies as poorly done, outdated, and below the reasonable standards.

132. Chevron had particular concerns that Syngenta had no evidence supporting claims that were no chronic effects of continual Paraquat exposure.

133. Syngenta did not perform any long-term neurotoxicity testing on Paraquat until 2003. At all relevant times, Syngenta possessed the technical capacity and resources to conduct such research.

134. Chevron never performed any long-term neurotoxicity testing on Paraquat. At all relevant times, Chevron possessed the technical capacity and resources to conduct such research.

135. Syngenta and Chevron both refused to perform any neurotoxicity testing on Paraquat with surfactant as used in a real-world application despite having the technical capacity and resources to do so.

136. As the years progressed, evidence that Paraquat causes Parkinson's continued to mount. In light of this, Syngenta commissioned a series of in-house studies in 2003 to attempt to validate the scientific literature, which by then showed a significant decrease in dopaminergic neurons as a result of Paraquat exposure.

137. In the first round of studies, a Syngenta scientist used a manual method for counting dopaminergic neurons. This led the scientist to conclude that there was no statistically-significant loss of dopaminergic neurons following Paraquat exposure, thereby contradicting the growing scholarly literature and supporting Syngenta's public statements that Paraquat does not cause Parkinson's disease.

138. Syngenta saw to it that the scientist's conclusions were published to much fanfare and widely reported in various outlets.

139. But the same Syngenta scientist later gained the ability to conduct a more precise, automated count of dopaminergic neurons. The Syngenta scientist then repeated the same studies, this time using the more precise counting method. In this second round, the scientist discovered a statistically-significant loss of dopaminergic neurons following Paraquat exposure. The scientist concluded that, thanks to the more precise methodology in the second round of studies, it was highly likely that the growing body of scientific literature was correct: Paraquat exposure is associated with loss of dopaminergic neurons.

140. Unlike the first round of studies, Syngenta never published or otherwise publicly released the second round of the scientist's studies—the ones linking Paraquat to Parkinson's disease.

141. Though, to date, Syngenta has never contested the results of the second round of studies, they have withheld them from the public, the medical and scientific communities, and regulators. Syngenta has, however, repeatedly referred to the first round of studies publicly and in submissions to state and federal regulators.

142. In 2004 or 2005, Syngenta communicated to its internal scientific and toxicology teams that under no circumstances should Paraquat be measured in the brain tissue of lab animals because detecting even a small amount could have negative implications for the company.

143. In addition to suppressing the results of its own studies showing a Paraquat-Parkinson's connection, Syngenta has also engaged in an active campaign to discredit outside scientists whose research supports the growing consensus that Paraquat causes Parkinson's disease.

144. For instance, Syngenta established a so-called Paraquat SWAT team to attack and discredit scientists whose results are contrary to Syngenta's public statements. That team has taken various actions, including pressuring publishers to remove the word "Paraquat" from abstracts of scientific articles, apparently on the theory that few people read beyond the abstract.

145. Syngenta also developed a website called "paraquat.com," which claims to share up-to-date information on the safety of Paraquat. Syngenta paid internet marketing consultants to ensure that paraquat.com would appear higher in Google search results as opposed to other websites that might have warned end-users of Paraquat's dangers. The website states that the science does not support a link between Paraquat exposure and Parkinson's disease, despite Syngenta's knowledge to the contrary.

146. Yet Syngenta studies from the same time period tell a vastly different story.

147. To begin with, several Syngenta-conducted or -commissioned studies from the late 1990s and early 2000s confirmed what studies from earlier periods had already discovered: the intended users of Paraquat rarely used full safety equipment and came into frequent contact with small amounts of Paraquat while mixing (including adding the required surfactant) and spraying the herbicide. For instance, a 1995 study of workers in U.S. orchards found that only half of Paraquat users wore gloves.

148. Further, a 1997 Syngenta study based in Spain required workers to wear the recommended personal protective equipment as a condition of study participation. Syngenta personnel monitored the

study participants to ensure that they used full personal protective equipment at all relevant times during the study. But despite these (mandatory) precautions, almost all of the study participants tested positive for Paraquat in their urine.

149. Other studies continued to confirm that Paraquat enters the brain. Concerned that lab rats may be too different from humans to generalize earlier findings, Syngenta commissioned a study using squirrel monkeys in 2010. Following administration of small, fixed doses of Paraquat, the squirrel monkeys were actually found to be *more* sensitive to Paraquat toxicity than mice. What's more, analysis of the monkey's frontal cortex region showed no measurable decline in Paraquat levels in samples taken six weeks apart. Syngenta scientists concluded that Paraquat can enter the brain, that mammals similar to humans are more sensitive to the neurotoxic effects of Paraquat than lab rats, and that Paraquat does not easily leave the brain once there.

150. Syngenta did not publish the squirrel monkey studies. Nor did it report them to state or federal regulators. Syngenta kept these studies hidden.

151. But Syngenta did, in 2011, publish the results of what it called an epidemiological study of Syngenta employees involved in Paraquat manufacturing. The study purported to show that there is no statistically-significant increase in the prevalence of Parkinson's disease among Syngenta employees who manufactured Paraquat. But the study was rejected by every reputable journal to which it was submitted. Even Syngenta's own internal reviewers questioned the study's validity. For one thing, Paraquat manufacture is a closed process: workers in the study (unlike Paraquat end-users) did not actually come into contact with Paraquat during manufacturing. Further, the Syngenta doctor that conducted the study relied exclusively on workers' death certificates to determine whether or not they had Parkinson's disease—a notoriously unreliable methodology because death certificates rarely list underlying conditions

that ultimately cause death. In the end, Syngenta paid a substantial fee to publish the study in an open-source journal.

152. Despite these shortcomings, Syngenta has frequently cited this study as disproving any epidemiological link between Paraquat and Parkinson's disease, both to the public and to state and federal regulators.

153. Paraquat.com claims that there is no epidemiological evidence of a Paraquat-Parkinson's connection. But Syngenta has never conducted an epidemiological study save for the fatally flawed 2011 study that it essentially self-published.

***Warnings of a Paraquat–Parkinson's Link***

154. At no time has Syngenta warned that exposure to Paraquat could cause Parkinson's disease or a precursor ailment outside of the EPA-approved pesticide label.

155. At no time has Chevron publicly warned that exposure to Paraquat could cause Parkinson's disease or a precursor ailment outside of the EPA-approved pesticide label.

156. This despite the fact that Syngenta and Chevron have admitted in that a Paraquat-Parkinson's causal connection is biologically plausible, that the numerous internal studies that they have conducted and shared with each other and their contractors and agents demonstrate a Paraquat-Parkinson's causal connection, and that numerous independent epidemiological studies have sounded the alarm of the catastrophic consequences.

157. All Defendants continue to publicly assert that Paraquat is safe and that it does not cause Parkinson's disease or precursor ailments.

158. Defendants committed, and continue to commit, affirmative independent acts of concealment (including acts and omissions) to intentionally mislead end-users and the medical community

as alleged above. This concealment prevented end-users, including Plaintiff, from asserting their legal rights because the facts to support their causes of action were not apparent to a reasonably diligent person.

159. Defendants committed, and continue to commit, acts of fraud that caused end-users, including Plaintiff, to relax their vigilance or deviate from their right of inquiry into the facts alleged in this complaint.

***Plaintiff Was an End-User of Paraquat and Exposed in Reasonably-Foreseeable Ways***

160. Plaintiff was first exposed to Paraquat in or about 2005. Plaintiff worked and lived in Oklahoma, where on information and belief, Plaintiff purchased, mixed and sprayed Paraquat. Plaintiff continued to be exposed to Paraquat in this manner until approximately 2007.

161. Plaintiff was exposed to Paraquat (1) when it was mixed, loaded, applied, and/or cleaned; (2) as a result of spray drift (the movement of Paraquat spray droplets from the target to area to an area where Paraquat application was not intended, typically by wind); and/or (3) as a result of contact with sprayed plants and equipment covered in Paraquat. Paraquat came into contact with Plaintiff's skin and clothes. Plaintiff inhaled Paraquat.

162. On information and belief, Plaintiff was exposed to Paraquat designed by Syngenta.

163. On information and belief, Plaintiff was exposed to Paraquat manufactured by Syngenta.

164. On information and belief, Plaintiff was exposed to Paraquat distributed by Syngenta.

165. On information and belief, Plaintiff was exposed to Paraquat designed by Chevron.

166. On information and belief, Plaintiff used Paraquat as intended—that is, as an herbicide.

167. Plaintiff would not have purchased or used Paraquat if Plaintiff had known that it could cause neurological injury or Parkinson's disease.

168. At all relevant times, it was reasonably foreseeable that when Paraquat was used in the intended or a reasonably foreseeable manner, users of Paraquat and persons nearby, such as Plaintiff, would be exposed to it.

169. Nothing prevented Defendants from warning consumers about the risks of Paraquat, or to provide proper instruction for use, outside of the label, meaning through mediums that are not EPA-approved. The EPA does not regulate all communications about pesticides; it only regulates pesticide labeling.

170. At all relevant times, it was reasonably foreseeable that Paraquat could enter Plaintiff's body: (1) through absorption or penetration of the skin, mucous membranes, and other epithelial tissues (including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage were present); (2) through the olfactory bulb; (3) through respiration into the lungs; and (4) through ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

***Plaintiff Has Been Injured by Their Contact with Paraquat***

171. As a result of Plaintiff's contact with Paraquat, Plaintiff has developed symptoms associated with Parkinson's disease.

172. Parkinson's disease is progressive and cannot be diagnosed using a blood test or other immediately-verifiable methodology.

173. Many individuals who suffer from, and will ultimately succumb to, Parkinson's diseases do not yet have a Parkinson's disease diagnosis.

174. Precursor ailments consist of symptomologies consistent with Parkinson's disease and with an eventual Parkinson's disease diagnosis.

175. Plaintiff's Parkinson's disease either has or will progress to become entirely debilitating. Plaintiff will lose the ability to control motor functions. Plaintiff will become unable to live independently. Parkinson's disease has or will result in permanent physical injuries, pain, mental anguish, and disability. These injuries will continue for the rest of Plaintiff's life.

176. Plaintiff will be required to incur significant costs and expenses related to medical care and treatment, as well as related costs.

177. Plaintiff has or will become unable to work or hold down steady employment.

178. Plaintiff has suffered general (non-economic) damages in a sum in excess of the jurisdictional minimum of this Court.

179. Plaintiff has suffered special (economic damages) in a sum in excess of the jurisdictional minimum of this Court.

***Plaintiff's Claims Are Timely***

180. Plaintiff filed suit within two years of learning that Plaintiff's exposure to Paraquat and/or surfactant designed, formulated, and manufactured by Syngenta and/or Chevron caused their Parkinson's disease or precursor ailment.

181. Plaintiff had no reason to suspect that their injuries had anything to do with their exposure.

182. Plaintiff was never told either by a medical professional, by media, or by the Defendants, that exposure to Paraquat could cause them to suffer Parkinson's disease or a precursor ailment.

183. Plaintiff did not know of the claims and their underlying facts asserted in this complaint, nor could any reasonable prudent person know of such claims.

184. Plaintiff did not possess the sufficient critical facts to put them on notice that the wrongs and the acts and omissions discussed herein had been committed because Defendants were and continue to conceal the acts and omissions noted herein.

185. At all relevant times, Plaintiff exercised reasonable diligence in investigating potential causes of their injuries by discussing their injuries with healthcare providers. None of the conversations gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Paraquat or Defendants' tortious conduct was the cause of such injuries.

186. Plaintiff was reasonably unaware, and had no reasonable way of knowing, that their injuries described above were caused by Defendant's conduct.

187. Further, Defendants' acts and omissions misled Plaintiff in regard to their causes of action and prevented them from asserting such rights because the facts which would support their causes of action as alleged in this complaint were not apparent to a reasonably prudent person.

188. Defendants also prevented Plaintiff from asserting their rights by committing affirmative independent acts of concealment as noted above upon which Plaintiff relied.

189. Defendants' misconduct and fraudulent concealment of the relevant facts deprived Plaintiff and Plaintiff's physicians of vital information essential to the pursuit of the claims in this complaint, without any fault or lack of diligence on their part. Plaintiff relied on Defendants' misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendants' tortious conduct.

190. Defendants also affirmatively induced Plaintiff to delay bringing this complaint by and through their acts and omissions as alleged herein.

191. In addition to the acts and omissions noted above, Defendants consistently misrepresented to Plaintiff and/or Plaintiff's physicians that Paraquat was not the cause of any of Plaintiff's injuries to delay their bringing a claim against Defendants.

***Plaintiff Makes No Claims Under Federal Law***

192. Paraquat is regulated by government authorities, but Plaintiff make no allegations under those statutes or their implementing regulations.

a. The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides within the U.S., requires that pesticides be registered with the U.S. Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

b. FIFRA has no private right of action and state tort claims do not arise under FIFRA.

193. As used in FIFRA, the term "label" means the written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers. 7 U.S.C. § 136(p)(1). The term "labeling," has a different meaning, defined as all labels and all other written, printed, or graphic matter accompanying the pesticide at any time, or to which reference is made on the label or in literature accompanying the pesticide. 7 U.S.C. § 136(p). Plaintiff does not challenge the content of Paraquat's EPA-approved label or packaging, does not allege that Defendants should have added any statement to or altered that label or packaging, and does not seek to impose any requirement for labeling or packaging "in addition to or different from" those required under FIFRA. 7 U.S.C. § 136v(b).

194. Plaintiff's failure-to-warn claims rest instead on Defendants' conduct outside the EPA-approved labeling and packaging—including Defendants' advertising, marketing, promotional statements, representations by sales and technical personnel, and training and stewardship communications that do not constitute "labeling" within the meaning of 7 U.S.C. § 136(p) because they neither accompanied Paraquat nor were referenced on its label. Independent of any labeling or packaging requirement under FIFRA, Defendants had a duty to disclose Paraquat's known and knowable risk of causing Parkinson's disease through these channels, and breached that duty.

195. Plaintiff's causes of action are solely under state law.

## CAUSES OF ACTION

### COUNT I—STRICT PRODUCTS LIABILITY DESIGN DEFECT AGAINST SYNGENTA

196. Plaintiff incorporates all other allegations herein.

197. Syngenta designed, manufactured, and sold Paraquat that Plaintiff was exposed to.

198. Plaintiff's exposure to Paraquat caused Plaintiff's Parkinson's disease or precursor ailment that will progress into Parkinson's disease.

199. Plaintiff is an ordinary consumer of Paraquat or was exposed by virtue of their close contact with ordinary consumers of Paraquat.

200. Paraquat did not perform as safely as an ordinary consumer would have expected it to perform when used in an intended way, including:

a. An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was used.

b. An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was not used.

c. An ordinary end-user of Paraquat would not have expected Paraquat to cause Parkinson's disease or precursor ailment.

201. Paraquat did not perform as safely as an ordinary consumer would have expected it to perform when used in an unintended but reasonably foreseeable way, including:

a. An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was used.

b. An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was not used.

c. An ordinary end-user of Paraquat would not have expected Paraquat to cause Parkinson's disease or precursor ailment.

202. Further, a reasonable person would conclude that possibility and seriousness of neurological injury caused by Paraquat, including Parkinson's disease and precursor ailments, outweighed the burden or cost of making Paraquat safe. In particular:

a. It is highly likely that low-dose Paraquat exposure will result in neurological injury including Parkinson's disease or a precursor ailment that will progress into Parkinson's disease.

b. Parkinson's disease is degenerative and chronic; there is no cure. Parkinson's disease causes intense suffering and a breakdown of the ability to live a normal life. Parkinson's disease is fatal.

c. The burden of making Paraquat safer was lesser than (i.e., outweighed by) the risk and seriousness of the injuries Paraquat causes.

d. The cost of making Paraquat safer was lesser than (i.e., outweighed by) the risk and seriousness of the injuries Paraquat causes.

203. The Paraquat to which Plaintiff was exposed was unreasonably dangerous when it left Syngenta's possession and control.

**COUNT II—STRICT PRODUCTS LIABILITY FAILURE TO WARN OUTSIDE THE LABEL AGAINST SYNGENTA**

204. Plaintiff incorporates all other allegations herein.

205. Syngenta is also liable to Plaintiff under a products liability theory based on its failure to adequately warn of the risks of Paraquat through channels other than Paraquat's EPA-approved labeling

and packaging—including Syngenta's advertising, marketing, promotional materials, representations by its sales and technical personnel, and its own stewardship and training communications, none of which constitutes "labeling" within the meaning of 7 U.S.C. § 136(p).

206. When Syngenta manufactured and sold the Paraquat to which Plaintiff was exposed, it was known or knowable to Syngenta in light of scientific knowledge that was generally accepted in the scientific community as well as Syngenta's own internal research and information that:

a. Paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b. When inhaled, ingested, or absorbed into the body, it was likely cause latent neurological damage that was both permanent and cumulative, and that repeated, low- dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

207. The risk of contracting Parkinson's disease from low-dose exposure to Paraquat presented a substantial danger to users of Paraquat when the product was used in a reasonably foreseeable manner.

208. An ordinary consumer would not have recognized the potential risk of permanent, irreversible neurological damage, including the risk of contracting Parkinson's disease, from low-dose exposure to Paraquat.

209. Through its advertising, marketing, promotional statements, sales representations, and its own stewardship and training communications—all separate from Paraquat's EPA-approved labeling and packaging—Syngenta failed to warn of the potential risk of permanent, irreversible neurological damage, including Parkinson's disease, from low-dose exposure to Paraquat. To the extent those communications addressed Paraquat's safety at all, they failed to disclose, and affirmatively minimized, this risk.

210. Syngenta also had opportunities to warn Paraquat users through safety trainings, certified-applicator education, product-stewardship materials, applicator bulletins, web-based modules, and communications from its sales, technical, and stewardship personnel. Syngenta knew Paraquat users were required, expected, or directed to rely on those channels for safety information separate from Paraquat's EPA-approved label and packaging. Yet Syngenta did not use those training and stewardship channels to warn that repeated low-dose exposure to Paraquat—including through mixing, loading, application, spray drift, contaminated equipment, dermal contact, inhalation, or ingestion—could cause permanent neurological injury, including Parkinson's disease.

211. Plaintiff does not allege in this Count that Paraquat's EPA-approved label or packaging was inadequate, and does not seek to impose any requirement for labeling or packaging in addition to or different from those required under FIFRA. 7 U.S.C. § 136v(b). This Count rests solely on Syngenta's conduct outside that labeling and packaging.

212. As a direct and proximate result of Syngenta manufacturing and selling a defective product, Plaintiff suffered the injuries described in this Complaint.

**COUNT III—NEGLIGENCE AGAINST SYNGENTA**

213. Plaintiff incorporates all other allegations herein.

214. Plaintiff does not allege in this Count that Paraquat's EPA-approved label or packaging was inadequate, and does not seek to impose any labeling or packaging requirement in addition to or different from those required under FIFRA. 7 U.S.C. § 136v(b). The negligence alleged in this Count concerns Syngenta's design, formulation, testing, and non-label communications, not the content of Syngenta's EPA-approved labeling or packaging. The negligence alleged here is separate and apart from any failure to warn claim.

215. Syngenta designed, manufactured, distributed, and sold Paraquat to which Plaintiff was exposed.

216. The Paraquat to which Plaintiff was exposed was used in the intended and/or a reasonably foreseeable manner.

217. At all times relevant to this claim, in researching, designing, manufacturing, distributing, and selling Paraquat, Syngenta owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to Paraquat, including Plaintiff.

218. When Syngenta designed, manufactured, packaged, distributed, and sold the Paraquat to which Plaintiff was exposed, it was reasonably foreseeable that Paraquat:

a. Was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b. When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it has been sprayed or areas near where it has been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

219. In breach of the aforementioned duties to Plaintiff, Syngenta negligently:

a. Failed to design, manufacture, formulate, and package Paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b. Designed, manufactured, and formulated Paraquat such that it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

c. Failed to conduct adequate research and testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

d. Failed to conduct adequate research and testing to determine the extent to which Paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying.

e. Failed to conduct adequate research and testing to determine the extent to which Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease.

f. Failed to disclose, through its advertising, marketing, and promotional materials, representations by its sales and technical personnel, and its own stewardship and training communications—all separate from Paraquat's EPA-approved labeling and packaging—that Paraquat was likely to cause neurological damage that was both permanent and cumulative, and that repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

220. Syngenta knew or should have known that users would not realize the dangers of exposure to Paraquat and negligently failed to take reasonable steps to prevent the foreseeable risk of harm from exposure to Paraquat.

221. As a direct and proximate result of Syngenta's negligence, Plaintiff suffered the injuries described in this Complaint.

**COUNT IV—NEGLIGENCE AGAINST CHEVRON**

222. Plaintiff incorporates all other allegations herein.

223. Plaintiff does not allege in this Count that Paraquat's EPA-approved label or packaging was inadequate, and does not seek to impose any labeling or packaging requirement in addition to or different from those required under FIFRA. 7 U.S.C. § 136v(b). The negligence alleged in this Count concerns Chevron's design, formulation, testing, marketing, stewardship, and non-label communications during the Chevron Period (see below), not the content of any EPA-approved labeling or packaging. The negligence alleged here is separate and apart from any failure to warn claim.

224. From approximately 1960 until approximately 1986 (the "Chevron Period"), Chevron served as the exclusive United States formulator and distributor of Paraquat and, together with Syngenta, designed, formulated, tested, registered, manufactured, marketed, and distributed Paraquat for the United States market. Plaintiff does not allege that Plaintiff used or was exposed to Paraquat formulated or distributed by Chevron; rather, the Paraquat to which Plaintiff was exposed was supplied by Syngenta and/or its licensees. Plaintiff alleges that Chevron's negligent conduct during the Chevron Period was a substantial factor in causing Plaintiff's injuries, as set forth below.

225. In undertaking the design, formulation, testing, registration, manufacture, marketing, and distribution of Paraquat for the United States market, Chevron owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable would be exposed to Paraquat—

including future end-users who would purchase, use, or come into contact with Paraquat after the Chevron Period. That duty extended to Plaintiff, a foreseeable end-user of the Paraquat product line that Chevron helped to design, formulate, and place on the United States market.

226. During the Chevron Period, it was reasonably foreseeable to Chevron that Paraquat:

a. Was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b. When so inhaled, ingested, or absorbed, was likely to cause neurological damage that was both permanent and cumulative, and that repeated, low-dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

227. In breach of the aforementioned duties, Chevron negligently:

a. Designed and formulated Paraquat, and made formulation decisions—including the decision to place Paraquat on the United States market without a protective co-formulant or surfactant—such that Paraquat was unreasonably likely to be inhaled, ingested, and absorbed into the bodies of persons who used it or were nearby, and to cause the neurological injuries described above;

b. Failed to conduct adequate research and testing to determine the extent to which exposure to Paraquat—including repeated, low-dose exposure—was likely to occur and was likely to cause or contribute to latent, permanent, and cumulative neurological damage and neurodegenerative disease, including Parkinson's disease;

c. Failed to disclose, through its advertising, marketing, and promotional materials, representations by its sales and technical personnel, and its own stewardship and training communications—all separate from Paraquat's EPA-approved labeling and packaging—of

Paraquat's known and knowable risk of causing permanent and cumulative neurological damage and Parkinson's disease;

d. Marketed and promoted Paraquat, including through aggressive "no-till" campaigns and co-opted "thought leaders," in a manner that encouraged widespread and intensive use of Paraquat without disclosing its neurotoxic risks or the need for protective measures; and

e. Participated with Syngenta in suppressing, concealing, and failing to disclose the association between Paraquat and Parkinson's disease, and in creating and promoting the false impression that Paraquat was safe, including by submitting or sponsoring data that masked Paraquat's risks.

228. Chevron's negligent conduct during the Chevron Period was a substantial factor in causing Plaintiff's Parkinson's disease and/or precursor neurological injuries—notwithstanding that Plaintiff was exposed to Paraquat supplied by Syngenta and/or its licensees after the Chevron Period—because:

a. The design and formulation decisions Chevron made—including the decision to market Paraquat without a protective co-formulant—became embedded in, and continued to characterize, the Paraquat that was thereafter manufactured, formulated, and sold to end-users, including the Paraquat to which Plaintiff was exposed;

b. The suppression, concealment, and non-disclosure of Paraquat's link to Parkinson's disease that Chevron undertook and helped to entrench persisted after the Chevron Period and continued to deprive end-users, including Plaintiff, of the warnings and information that would have caused Plaintiff to avoid or reduce exposure to Paraquat; and

c. The patterns of intensive, unprotected Paraquat use that Chevron promoted and established persisted after the Chevron Period and shaped the manner in which Plaintiff and others used and were exposed to Paraquat.

229. As a direct and proximate result of Chevron's negligence during the Chevron Period, Plaintiff suffered the injuries described in this Complaint, including Parkinson's disease and/or precursor neurological injuries.

**COUNT V—BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (SYNGENTA)**

230. Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth therein.

231. At all relevant times, Syngenta was engaged in the business of selling Paraquat products and was a merchant with respect to those products.

232. At all relevant times, Syngenta intended and expected that its Paraquat products would be sold and used throughout the United States, including in the State of Illinois.

233. Syngenta developed, manufactured, distributed, and sold Paraquat for use in formulating its Paraquat products, and developed, registered, formulated, and distributed its Paraquat products for sale in the United States, including the State of Illinois.

234. Decedent was exposed to Syngenta's Paraquat products regularly and repeatedly, for hours at a time, resulting in regular, repeated, and prolonged exposure to Paraquat.

235. At the time of each sale of Syngenta's Paraquat products that resulted in Decedent's exposure to paraquat, Syngenta impliedly warranted that its Paraquat products were of merchantable quality, including that they were fit for the ordinary purposes for which such goods were used.

236. Syngenta breached this warranty as to each sale of its Paraquat products that resulted in Decedent's exposure to Paraquat, in that Syngenta's Paraquat products were not of merchantable quality because they were not fit for the ordinary purpose for which such goods were used by Decedent who was either in direct privity with Syngenta through purchase of the Paraquat products or was an employee

of the purchaser to whom the warranty was directly made and, therefore, an intended third-party beneficiary of such warranties.

237. As a direct and proximate result of the breaches of the implied warranty of merchantability by Syngenta, Decedent suffered severe and personal injuries that were permanent and lasting in nature, physical pain and mental anguish including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

## DEMAND FOR JURY TRIAL

238. Plaintiff incorporates all other allegations, including all causes of action, herein.

239. Plaintiff demands a jury trial on all issues contained herein.

## PRAYER FOR RELIEF

240. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor against all Defendants as follows:

(1) Judgment for Plaintiff and against Defendants.

(2) For medical and related expenses, according to proof.

(3) For loss of earnings and/or earning capacity, according to proof.

(4) For exemplary or punitive damages, according to proof.

(5) For mental and physical suffering, according to proof.

(6) For Plaintiff's cost of suit herein.

(7) For disgorgement of profits, according to proof.

(8) Default judgment as a sanction for the bad faith destruction of evidence, if any, and according to proof, if any.

(9) For such other and further relief as this Court may deem just and proper, including prejudgment interest.

Dated: September 21, 2026

Respectfully submitted,

*/s/ R. Brent Wisner*________________
R. Brent Wisner, Esq. (Identification No. 335346)
Harrison E. James, Esq. *(pro hac vice forthcoming)*
Conor Kennedy, Esq. *(pro hac vice forthcoming)*
**WISNER BAUM, LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
Tel: (310) 207-3233
rbwisner@wisnerbaum.com
hjames@wisnerbaum.com
ckennedy@wisnerbaum.com